IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| ERIC DANIEL PEALER, | § | |
| --- | --- | --- |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 4:18-cv-00944-P |
| | § | |
| UNITED STATES OF AMERICA, | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court is Defendant United States of America's Motion for Summary Judgment (ECF No. 31), Plaintiff Eric Daniel Pealer's Response (ECF No. 46), and the United States' Reply (ECF No. 48). Having considered the motion, briefing, and applicable law, the Court finds that the United States' Motion for Summary Judgment should be and is hereby **GRANTED.** Accordingly, Pealer's claims against the United States are hereby **DISMISSED with prejudice.**

## BACKGROUND

Pealer, a 37-year-old man, went into custody of the Federal Bureau of Prisons (BOP) on November 19, 2015, entering at FMC Fort Worth. Def.'s App. MSJ at 1, 4, 6, ECF No. 33-1. On the day Pealer arrived at FMC Fort Worth, he underwent a health-intake screening during which he reported a history of melanoma in his left eye that had been treated with surgery and radiation. *Id.* at 1–2, 10–16. A nurse noted that Pealer was blind in his left eye as a result and that he had been undergoing frequent monitoring but no other

treatment at the time of his imprisonment. *Id.* at 12. Four days later, a BOP physician evaluated Pealer. *Id.* at 17–20; *see also* Compl. at ¶ 13, ECF No. 1. Pealer reported a history of surgical removal of a melanoma from his left eye retina in 2006, which resulted in blindness in that eye. Def.'s App. MSJ at 17. The physician placed consultation requests for an oncologist and an ophthalmologist to evaluate Pealer. *Id.* at 17, 19–20; Compl. at ¶ 13.

The following spring, Pealer had both consultations. On April 5, 2016, an oncologist/hematologist evaluated him. Def.'s App. MSJ at 21, 24. The specialist recommended that Pealer return in six months and that he should also have an appointment with an ophthalmologist. *Id.* A month later, an ophthalmologist evaluated Plaintiff. *Id.* at 26, 29–30. The ophthalmologist recommended a referral for a B-Scan to monitor Pealer for regrowth of the melanoma, and also recommended follow up with ophthalmology in a month for further evaluation. *Id.*

On June 27, 2016, Pealer reported left eye pain during sick call rounds. *Id.* at 32. He also reported that he had a mole on his head and a mole on his stomach, both of which appeared to be getting bigger and were sensitive. *Id.* Pealer was scheduled to see a provider and saw a nurse practitioner the following month. *Id.* at 34–36. He again reported left eye pain and noted that the two moles appeared to be getting bigger and were sensitive. *Id.* at 34. The nurse practitioner examined Pealer and placed a dermatology consultation request. *Id.* at 34–35. Approximately one week later, Pealer saw the ophthalmologist again. *Id.* at 37–39. He underwent a B-Scan, which showed "likely regrowth of prior choroidal melanoma" in Pealer's left eye. *Id.* at 37. On the same day, Pealer's physician placed a

consultation request for an oculoplastics evaluation for possible enucleation of Pealer's left eye. *Id.* at 40.

Six days later, an oculoplastics specialist evaluated Pealer and recommended enucleation of Pealer's left eye for uveal melanoma, as a retina specialist had also recommended. *Id.* at 41–42. The provider noted that Pealer's B-Scan showed melanoma in the left eye. *Id.* at 41. Four days later, Pealer's physician placed a consultation request for oculoplastics for a left eye enucleation. *Id.* at 43. A nurse practitioner later followed up with Plaintiff and discussed the plan to remove his eye. *Id.* at 44–45. Pealer indicated he was aware of the removal plan, and he does not dispute that he agreed to undergo the procedure. *Id.* at 44; Compl. at ¶ 15.

On September 15, 2016, Pealer underwent enucleation of his left eye, with implant. Def.'s App. MSJ at 51–53. Dr. Matthew Hammons of the Fort Worth Surgery Center, performed the surgery. *Id.* at 51–52. The pre- and post-operation diagnoses were melanoma of the left eye. *Id.* at 51. The pathology report, which was faxed to FMC Fort Worth on October 13, 2016, indicated there was a "necrotic neoplasm of choroid, with patchy calcifications, consistent with previous radiation therapy of melanoma." *Id.* at 64–65. The report noted that there was "[n]o visible malignant melanoma . . . present, but tumor cell ghosts are identified within the choroidal mass." *Id.* at 64.

Upon Pealer's return to FMC Fort Worth after the enucleation surgery, a registered nurse evaluated him. *Id.* at 46–50. The nurse gave Pealer post-op instructions and placed orders for Tylenol #3 and promethazine. *Id.* at 47. The following day, Pealer's physician evaluated him and provided further post-op instructions. *Id.* at 54–55. Because Pealer was

3

reporting pain at a level of 8 out of 10, his physician increased the dose of Tylenol #3 to two pills, three times a day, as needed for three days. *Id.* at 54. A few weeks later, Pealer was seen by oncology/hematology. *Id.* at 56, 59. The oncologist requested a follow-up evaluation in four months with lab work. *Id.* Less than a month after Pealer's enucleation surgery, the surgeon who performed Pealer's surgery also saw him for a follow-up appointment. *Id.* at 60–63. At that appointment, it was noted that Pealer was concerned that his eye was not opening completely. *Id.* at 60. However, the provider noted that Pealer's movement was "excellent" and that Pealer would be "OK for prosthesis in 2 more weeks." *Id.*

The following month, Pealer's physician saw Pealer for a chronic care evaluation. Def.'s App. MSJ at 72–75. Plaintiff reported no complaints with his left eye or any other part of his body. *Id.* at 72. His physician placed a routine consultation request for Pealer to be evaluated by oculoplastics. *Id.* at 74. In February 2017, Pealer saw the oculoplastics specialist, who recommended an appointment with an ocularist for an ocular prosthesis and an appointment with an oncologist to rule out systemic melanoma. *Id.* at 89–94. The oculoplastics specialist noted that Pealer's socket was healthy and that his conformer was in place. *Id.* at 93. Five days later, Pealer was seen by oncology/hematology for monitoring of his melanoma. *Id.* at 95–100. The specialist recommended that Pealer follow up in six months and have lab and x-ray results ready for review at the appointment. *Id.* at 95, 99.

A few months later, Pealer saw his physician again at a chronic care encounter. *Id.* at 101–03. Plaintiff again had no complaints, and his physician placed a consultation request for oculoplastics to have Pealer evaluated for an ocular prosthesis. *Id.* at 101, 103.

4

Pealer was seen by oncology/hematology approximately six months after his previous oncology/hematology appointment. *Id.* at 104–09. The specialist again recommended that Pealer follow up in six months to continue monitoring his melanoma. *Id.* at 104, 108. A couple of months later, Pealer saw an ocularist. *Id.* at 110–14. The ocularist noted that Pealer's socket "looks well and has healed nicely" and that he was ready for the design and fitting of a prosthesis. *Id.* at 110, 113. The ocularist requested that BOP call the ocularist's office to schedule the appointment. *Id.* Pealer received his ocular prosthesis on June 7, 2018, and the ocularist remarked that everything had turned out well. *Id.* at 115–16.

On January 29, 2018, the BOP received an administrative complaint from Pealer in which he claims that the removal of his eye was "unnecessary" because "[t]he pathology report showed that there had in fact been no compromise in the eye wall and that [his] cancer was in fact still in remission." Def.'s App. MSJ at 117, 119–24. He further claimed that he was "supposed to have a permanent prosthetic eye within a relatively short time" but that he did not timely receive one, "causing [his] eye socket to become permanently disfigured." *Id.* at 121. Pealer sought $250,000 in damages. *Id.* After receiving no administrative decision within six months, Pealer timely filed a complaint in this Court on November 26, 2018. See Doc. 1; 28 U.S.C. §§ 2401(b); 2675(a). He seeks $2.375 million for alleged past and future pain and suffering, future medical costs, future lost earning capacity, and past and future emotional and psychological injury. Compl. at ¶ 25. On September 27, 2019, the United States filed this Motion for Summary Judgment. *See* ECF

No. 31. Having been fully briefed, the Motion for Summary Judgment is ripe for the Court's consideration.

## LEGAL STANDARD

Summary judgment is proper when the pleadings and evidence on file show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "[T]he substantive law will identify which facts are material." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505 (1986). A genuine dispute as to any material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The movant makes a showing that there is no genuine dispute as to any material fact by informing the court of the basis of its motion and by identifying the portions of the record which reveal there are no genuine material fact issues. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548 (1986); FED. R. CIV. P. 56(c).

When reviewing the evidence on a motion for summary judgment, the court must decide all reasonable doubts and inferences in the light most favorable to the non-movant. *See Walker v. Sears, Roebuck & Co.*, 853 F.2d 355, 358 (5th Cir. 1988). The court cannot make a credibility determination in light of conflicting evidence or competing inferences. *Anderson*, 477 U.S. at 255. As long as there appears to be some support for the disputed allegations such that "reasonable minds could differ as to the import of the evidence," the motion for summary judgment must be denied. *Id.* at 250.

**ANALYSIS**

The United States moved for summary judgment on the grounds that they cannot be held accountable for the conduct of independent contractors and that Pealer has failed to designate any expert witnesses to support his medical malpractice claim. Br. Supp. MSJ at 5, ECF No. 32. Because expert testimony is required to support a medical malpractice claim and because Pealer has failed to designate any expert witnesses, summary judgment should be granted.[1]

The Federal Tort Claims Act (FTCA) authorizes civil actions for damages against the United States for personal injury or death caused by the negligence of a government employee under circumstances in which a private person would be liable under the law of the state in which the negligent act or omission occurred. 28 U.S.C. §§ 1346(b)(1), 2674. State law controls liability for medical malpractice under the FTCA. *Ayers v. United States*, 750 F.2d 449, 452 n. 1 (5th Cir. 1985). Under Texas law, in a medical malpractice action, the plaintiff bears the burden of proving (1) the physician's duty to act according to an applicable standard of care; (2) a breach of that standard of care; (3) injury; and (4) causation. *Quijano v. United States*, 325 F.3d 564, 567 (5th Cir. 2003). The plaintiff must establish the standard of care as a threshold issue before the factfinder may consider whether the defendant breached that standard of care to the extent it constituted negligence. *Id.* "Unless the mode or form of treatment is a matter of common knowledge or is within

---

[1] Although the United States makes arguments regarding both expert witnesses and independent contractors, because the outcome of the expert witness argument is dispositive, the Court will not address the independent contract argument.

the experience of the layman, expert testimony will be required" to meet the plaintiff's burden of proof. *Hood v. Phillips*, 554 S.W.2d 160, 165–66 (Tex. 1977). The Fifth Circuit has determined that when an expert witness is required and a *pro se* plaintiff fails to provide or designate one, the case may be dismissed at the summary judgment stage. *See Hannah v. United States*, 523 F.3d 597, 602 (5th Cir. 2008).

The Court's Scheduling Order established the week of January 27, 2020 as the trial date in this case, and 120 days before trial, or September 29, 2019, as the deadline to designate experts. *See* ECF No. 21. As of the date of this order, Pealer has neither designated experts nor acknowledged his failure to do so by requesting leave to designate experts or providing an explanation to the Court. In fact, after receiving the United States' Motion for Summary Judgment, which addresses his failure to designate experts, Pealer still failed to explain that shortcoming in his response to the motion. *See generally* Pl.'s Resp. MSJ, ECF No. 46. Because oncology, opthamology, and the practice of oculoplastics are not matters of common knowledge or within the general experience of a layman, Pealer was required to present expert testimony to establish the applicable standard of care and to show how the care he received breached that standard. *Hannah*, 523 F.3d at 523. Pealer's medical malpractice claims fail as a matter of law without the support of expert testimony. *Hood*, 554 S.W.2d at 165–66. Therefore, summary judgment is **GRANTED** in favor of the United States and Pealer's claims are **DISMISSED with prejudice.**

## CONCLUSION

The Court finds that summary judgment should be and hereby is **GRANTED** in favor of the United States and Pealer's claims are **DISMISSED with prejudice.**

**SO ORDERED** on this **23rd day** of **December, 2019**.

Mark T. Pittman
UNITED STATES DISTRICT JUDGE